Scott A. McMillan, Cal. Bar. No. 212506
Evan Kalooky, Cal. Bar. No. 247851
**THE MCMILLAN LAW FIRM, APC**
4670 Nebo Drive, Suite 200
La Mesa, California 91941-5230

(619) 464-1500 x 14
Fax: (206) 600-5095
E-mail: scott@mcmillanlaw.us

Lawyers for Sean Ryan and The McMillan Law Firm, APC, appearing Pro Hac Vice.

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| | Case No.:09-31828 (BJH) |
| IDEARC INC., et al., | (Jointly Administered) |
|     Debtors. | |
| | |
| SEAN RYAN, | ADVERSARY COMPLAINT |
|     Adversary plaintiff, | |
|     vs. | |
| VERIZON COMMUNICATIONS, INC., | |
| A Delaware corporation, SCOTT W. | |
| KLEIN, KATHERINE J. HARLESS, | |
| SAMUEL D. JONES, ANDREW | |
| COTICCHIO, THERESA MURRAY, | |
| JOHN W. DIERCKSEN, JOHN J. | |
| MUELLER, DONALD B. REED, | |
| STEPHEN L. ROBERTSON, THOMAS | |
| S. ROGERS, RICHARD CARRION, | |
| JOSEPH NEUBAUER, THOMAS | |
| O'BRIEN, HUGH PRICE, JOHN | |
| STAFFORD, ROBERT LANE, DONALD | |
| NICOLAISEN, CLARENCE OTIS, | |
| MARTHA KEETH, DR. SANDRA O. | |
| MOORE, IVAN SEIDENBERG, | |
| individuals, JPMorgan Chase Bank, N.A., | |
| in its capacity for itself and a syndicate of | |
| lenders that extended credit, | |
| | |
|     Adversary defendant | |

Sean Ryan alleges as follows:

I.      Parties

1.      Plaintiff Sean Ryan, an individual, is a resident of San Diego County, State of California.  Sean Ryan is a former employee of Verizon Communications, Inc., by way of its wholly owned, controlled, and utterly dominated subsidiary Verizon Directories Sales-West, Inc., a Delaware corporation.  Sean Ryan is a "creditor" of Idearc, within the meaning 11 U.S.C. § 101(10) and Delaware Code Title 6 § 1301, subd. (4), holding a claim that accrued in or around March of 2006, within the meaning of 11 U.S.C. § 101(5) and 6 Del. C. § 1301, subd. (3).


2.      Debtor Idearc, Inc., lead debtor herein, is a Delaware corporation, similarly, as are the nine companion debtors Idearc Information Services LLC, Idearc Media LLC, Idearc Media Services – East Inc., Idearc Media Services – West Inc., Idearc Media Sales – West Inc., Idearc Media Sales – East LLC, Idearc Media Sales – East Co., License Application Corporation, and
Second License Application Corporation, which are referred to herein as simply "Idearc." Plaintiff alleges that Idearc, Inc., was wholly dominated and controlled by Defendants, which all were formed under the provisions of the law of the State of Delaware.


3.      Defendant Verizon Communications, Inc., is a Delaware corporation, and is the predecessor and parent corporation of Idearc Media.  Idearc was formed in 2006 as a Delaware corporation in anticipation of a spin-off of Verizon Communications Inc.'s ("Verizon") directory operations.   Plaintiff alleges that Verizon is and was an "insider" to Idearc, as that term is used in 11 U.S.C. § 101(31) at all times preceding the spin off, and thereafter, and Verizon is an insider within the meaning of 6 Del. C. § 1301, subd. (7) and an affiliate within the meaning of 6 Del. C. § 1301 subd. (1).  Plaintiff alleges that Verizon, and the

4.     Defendant JPMorgan Chase Bank, N.A. ("Chase") as the administrative agent for a syndicate of lenders under the terms of a prepetition credit agreement with the Debtors, is sued directly and as agent for the syndicate of the lenders. Chase may be served with process by serving its registered agent, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.  Plaintiff alleges on information and belief, that Chase, by virtue of operation of its security agreements and its discretionary conduct under such agreements, was an "insider" within the meaning of 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), from November 17, 2006, through the present, in that it asserted domination and control over Debtor Idearc following the spin.  Specifically, Plaintiff is informed and believes that Chase had more ability to assert control than the other creditors, that Chase made management decisions for the debtor such as appointing the executive search consultants, directed work performance, and directed payment of the debtor's expenses.

5.     Defendant Scott W. Klein ("Klein") is Idearc's Chief Executive Officer ("CEO") and has served the Debtor in this capacity since June 2, 2008.  Defendant Klein may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.  Mr. Klein has been an "insider" to Idearc, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), since June 2, 2008,  and thereafter.

6.     Defendant Katherine J. Harless ("Harless") was President of Verizon Information Services Inc. from 2000 to November 2006, and then Debtor's President and CEO November 2006 through February 16, 2008. Defendant Harless is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), at all times preceding the spin off, and thereafter.  Plaintiff is informed and believe that on November 16, 2006, Defendant Harless was a director of the Debtor, or appointed shortly thereafter.  Defendant Harless may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

7.     Defendant Samuel D. Jones ("Jones") is Debtor's Executive Vice President, CFO and Treasurer.  Jones served in this capacity on an acting basis from November 27, 2007 to September 2008, and was formally named in this capacity on September 2, 2008. Defendant Jones is and was an "insider" to Verizon and Idearc, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), at all times preceding the spin off, and thereafter. Defendant Jones may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

8.     Defendant Andrew Coticchio ("Coticchio") was Debtor's Executive Vice President, Chief Financial Officer ("CFO") and Treasurer of the Debtor from 2003 through November 26, 2007. Defendant Coticchio is and was an "insider" to Verizon and Idearc, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), at all times relevant preceding the spin off, and thereafter.   Defendant Coticchio may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

9.     Defendant Frank P. Gatto ("Gatto") is Debtor's Executive Vice President of Operations.  Gatto also served as interim CEO from February 27, 2008 through June 1, 2008. Defendant Gatto is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), at all times relevant preceding the spin off, and thereafter.  Defendant Gatto may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

10.     Defendant Theresa Murray was the Assistant Treasurer, of the debtor, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Murray may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

11.     Plaintiff is informed and believe that Defendant John W. Diercksen was the sole

director of the debtor prior to November 16, 2006, and resigned shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter. Defendant Diercksen may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

12.    Plaintiff is informed and believe that Defendant John J. Mueller was a director of the debtor prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter. Defendant Mueller may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

13.    Plaintiff is informed and believe that Defendant Donald B. Reed was a director of the debtor prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter. Defendant Reed may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

14.    Plaintiff is informed and believe that Defendant Stephen L. Robertson was a director of the debtor prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter. Defendant Robertson may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

15.    Plaintiff is informed and believe that Defendant Thomas S. Rogers was a director of the debtor prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter. Defendant Rogers may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

16.     Plaintiff is informed and believe that Defendant Richard Carrion was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Carrion may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

17.     Plaintiff is informed and believe that Defendant Joseph Neubauer was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Neubauer may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

18.     Plaintiff is informed and believe that Defendant Thomas O'Brien was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant O'Brien may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

19.     Plaintiff is informed and believe that Defendant Hugh Price was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Price may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

20.     Plaintiff is informed and believe that Defendant John Stafford was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Stafford

ADVERSARY COMPLAINT

may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

21.     Plaintiff is informed and believe that Defendant Robert Lane was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Lane may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

22.     Plaintiff is informed and believe that Defendant Donald Nicolaisen was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Nicolaisen may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

23.     Plaintiff is informed and believe that Defendant Clarence Otis was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Otis may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

24.     Plaintiff is informed and believe that Defendant Martha Keeth was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter.  Defendant Keeth may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

25.     Plaintiff is informed and believe that Defendant Dr. Sandra O. Moore was a director of Verizon Communications, Inc. prior to November 16, 2006, or shortly

thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter. Defendant Moore may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX 75261.

26.     Plaintiff is informed and believe that Defendant Ivan Seidenberg was the chairman of the board of directors of Verizon Communications, Inc. prior to November 16, 2006, or shortly thereafter, and is and was an "insider" to Idearc and Verizon, as that term is used in 11 U.S.C. § 101(31), and 6 Del. C. § 1301, subd. (7), on August 23, 2007, and thereafter. Defendant Seidenberg may be served at 2200 West Airfield Drive, DFW Airport, Dallas, TX  75261.

BACKGROUND

27.     On August 16, 2005, Plaintiff Sean Ryan submitted an employment application to Verizon. August 20, 2005, Verizon hired Mr. Ryan. On March 21, 2006, Verizon fired Sean Ryan. Sean Ryan's unliquidated claim against Verizon arose on March 21, 2006. On August 2, 2006, Sean Ryan sued Verizon Directories Sales-West, Inc., a Delaware corporation, in the Superior Court of California, for the County of San Diego, in a case styled *Sean Ryan v. Verizon Directories Sales-West, Inc.*, a Delaware corporation, case number GIN 0545512, alleging that Verizon withheld Mr. Ryan's wages upon discharge, that Verizon failed to compensate Mr. Ryan for his work expenditures, for conversion, for wrongful termination, for breach of contract, for breach of the covenant of good faith and fair dealing, for employment discrimination, and for unfair competition. On August 20, 2006, Verizon, through its incarnation "Verizon Directories Sales-West, Inc., a Delaware corporation" submitted a Verified Answer. In 2007, Sean Ryan prevailed on

some of his claims at jury trial and then court trial, and thereafter was awarded attorneys fees. As a result of that trial and post trial proceedings, Sean Ryan, with attorneys fees included is owed a combined sum of $172,590.14, exclusive of additional fees and interest. Judgment was entered in that action on March 10, 2008. Appeals followed, which have now been stayed as a result of the filing of the main bankruptcy case.

28.     Verizon Communications, Inc., formed Idearc in late 2006 as a Delaware corporation in anticipation of a spin-off of Verizon Communications Inc.'s ("Verizon") directory operations. Plaintiff is informed and believes that although the divisions that constituted what is presently identified as Debtor Idearc only generated 4% of revenue of Verizon, and only 5.7% of Verizon's debt load, the $9.1 Billion dollars of debt incurred by the Verizon-dominated-Idearc was nearly 22% of Verizon's entire debt. The spin-off, according to Doreen Toben, Verizon's CFO, as stated in a December 6, 2006 press release issued by Verizon, was to have "strengthened Verizon's balance sheet." However, no countervailing consideration, in accordance with Defendant Verizon's fiduciary duty to the creditors of Idearc, was provided to Debtor Idearc to cover the $9.1 Billion in detriment Debtor Idearc suffered.

29.     The formation of Idearc occurred after the accrual of Sean Ryan's claim herein. The spin-off occurred on November 17, 2006 through a distribution by Verizon of its shares of Idearc common stock to Verizon's shareholders, who received one share of Idearc common stock for every twenty shares of Verizon common stock. In connection with the spin-off, Verizon transferred to Idearc all of Verizon's ownership interest in Verizon Information Services Inc. and other assets, businesses and employees primarily related to Verizon's domestic print and internet yellow pages directories publishing operations (the "Contribution"). Verizon also purported to transfer its "liabilities," notwithstanding that as a result of the spin-off, Idearc became an independent public company. Sean Ryan did not consent to Verizon's transfer of its liabilities owed to him

to Idearc, and does not consent to Verizon's supposed transfer of its liabilities to Idearc.

30.    Purportedly, Idearc continues to have a number of significant commercial arrangements with Verizon.  Purportedly, Idearc is the exclusive official publisher of Verizon print directories in the markets where Verizon is the incumbent local exchange carrier, and Idearc uses the Verizon brand and logo in its print directories in both incumbent and expansion markets.

31.    As part of the spin-off, Verizon forced Idearc to incur $9,115,000,000 of debt, comprised of senior unsecured notes in the amount of $2,850,000,000 and senior, and purportedly "secured" term loan facilities in an aggregate amount of $6,265,000,000, consisting of: (1) a tranche A term loan facility of $1,515,000,000 (the "Tranche A Facility"); (2) a tranche B term loan facility of $4,750,000,000 (the "Tranche B Facility"); and (3) a $250,000,000 revolving credit  facility.  Now, Debtor Idearc claims to be indebted to a large syndicate of lenders in the aggregate outstanding principal amount of not less than $6,400,000,000 (plus accrued and unpaid interest) pursuant to a supposed "senior secured" Credit Agreement (as amended, supplemented or otherwise modified, the "Senior Credit Facility"), dated as of November 17, 2006, among the wholly controlled by Verizon Idearc, the lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as administrative agent for such lenders. The Senior Credit Facility consists of: (1) the Tranche A Term Loan Facility in the outstanding principal amount of $1,515,000,000; (2) a Tranche B Term Loan Facility in the outstanding principal amount of $4,655,000,000; and (3) a Revolving Credit Facility in the outstanding principal amount of $250,000,000. The Senior Credit Facility is supposedly "secured by substantially" all of Idearc's present and after acquired assets, and is supposedly "guaranteed on a secured basis" by substantially all of Idearc's subsidiaries, including each of the Debtors herein.

32.     In addition to the Debtors' secured debt, Verizon issued through entirely Verizon controlled Idearc $2,850,000,000 in "senior unsecured notes." The senior unsecured notes, originally issued on or about November 17, 2006 in a private placement pursuant to Rule 144A and Regulation S under the Securities Act of 1933, as amended (the "Securities Act"), were exchanged in the second quarter of 2007 for an equal principal amount of a new issue of senior unsecured notes registered under the Securities Act. The senior unsecured notes are structurally subordinated to Idearc's obligations under the Senior Credit Facility to the extent of the value of the assets securing the indebtedness under that facility. Additionally, the Verizon controlled Idearc guaranteed the "senior unsecured notes" by substantially all of Idearc's subsidiaries, which were also entirely then controlled and dominated by Verizon.

33.     As acknowledged by Defendant's Annual Report issued in March of 2007:

Spin-off of Verizon Information Services

> "On November 17, 2006 we completed the spin-off of Idearc to shareowners of Verizon. Verizon distributed a dividend of one share of Idearc common stock for every 20 shares of Verizon common stock. Cash was paid for fractional shares. The distribution of Idearc common stock is considered a tax free transaction for us and for our shareowners, except for the cash payments for fractional shares which are generally taxable. Idearc now owns what was the Verizon domestic print and Internet yellow pages directories publishing operations, which had been the principal component of our Information Services segment. This transaction resulted in an *increase* of nearly $9 billion in shareowners' equity, as well as a *reduction* of total debt by more than $7 billion and we received approximately $2 billion in cash."

(Annual Report, issued March 1, 2007, page 12 (*Emphasis added*).)

34.    In avoiding the fundamental concept of accounting, to wit: the Law of the
Conservation of Money, e.g., that for every debit in one column, a credit must issue in
another — Defendant Verizon intentionally, openly, and notoriously "spun" an insolvent
business.   In light of the fact that the spinoff was entirely internal to Verizon, the value
of business division that was to become Idearc as reflected on in the balance sheet of
Defendant Verizon should have exactly corresponded to the amount of the sale
transaction as Debtor Idearc was not *sold* to a third party.  The additional "$9 billion in
shareowners' equity" came from Defendant Chase, by way of debt placed on an over
encumbered Debtor Idearc.  Under relevant Delaware law, Debtors Idearc, collectively,
were insolvent as "an entity is insolvent when it has liabilities in excess of a reasonable
market value of assets held." (*Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 789
(Del. Ch. 1992).)   To the extent that Debtors Idearc, were not insolvent, said Debtor
companies were "operating in the vicinity of insolvency."

35.    Idearc, and each of its debtor affiliates, were "insolvent" within the meaning of 11
U.S.C. 101(32) from November 16, 2006, through the present.   Under Delaware law, and
as set forth above in the preliminary facts, upon the Debtors' birth into "insolvency,"  the
officers and directors of Defendant Verizon and Debtors Idearc, owed fiduciary duties to
the creditors, including Sean Ryan, herein.   Accordingly, Defendant Verizon and the
individual director and officer defendants herein bear the burden of demonstrating
fairness, i.e., the existence of a proper business purpose for the spin-off but also the
fairness to the creditors of all aspects of the transaction.

36.    Defendant Verizon and Chase, and each of the individual defendants were actually
aware, or alternatively, were aware of facts that placed it on notice, that Idearc, and each
of its debtor affiliates, were "insolvent" within the meaning of 11 U.S.C. 101(32) from

November 16, 2006, through the present.

37.     Defendants and each of them, were aware of the various statutes of limitations relating to creditor remedies available to creditors such as Sean Ryan, and intentionally made statements intending to mislead creditors and prospective investors as to the financial stability and prospects of the Debtors, such that any applicable statutes of limitations that would otherwise bar a claim should be tolled.

38.     Specifically, in an effort to mislead and misguide Sean Ryan and others from asserting their rights, at year end 2006 and during 2007, the Debtor Idearc touted the fact that "stringent" policies, process re-engineering and system improvements in its credit and collections between 2003 and 2006 caused bad debts to steadily decline as follows: 2003 – 8.1%; 2004 – 6.6%; 2005 – 4.9%; 2006 – 4.3%.  While touting the Debtor Idearc's purportedly "stringent" credit and collection policies, however, the investment community was unaware that the Debtor Idearc had "relaxed" its credit policies in order to increase the dollar amount of revenue reported to stockholders.

39.     The Debtor Idearc, by selling to non-credit-worthy customers effectively reported tens of millions of dollars of sales that it otherwise would not have reported while accumulating tens of millions of dollars of uncollectible receivables.  The Debtor Idearc carried these uncollectible receivables on its books as though they were collectible until mid-2008, when the Debtor Idearc admitted to a "relaxation of certain aspects of the Debtor Idearc's credit policy" and began to write off these uncollectible receivables in a piecemeal fashion over several quarters.

40.     During 2008, the Debtor Idearc wrote off $47 million of worthless receivables that it attributed to its relaxation of credit policies in mid-2007.  This incremental $47 million write-off of receivables (an amount that was material to the Debtor Idearc's reported

$279 million pre-tax income for 2008) had a profound effect because (i) it represented the non-collection of $47 million of cash that the investment community expected the Debtor Idearc to collect and (ii) it materially contributed to the Debtor Idearc's need to file for bankruptcy protection.

41.     On March 8, 2007, the Debtor Idearc filed its Form 10-K for the year ended December 31, 2006 with the SEC (the "2006 Form 10-K") which stated, in relevant part:

> Billing and Credit Control Currently, we direct bill more than 80% of our customers. By the end of 2007, we anticipate migrating our remaining customers to our direct billing systems. We have a billing and collection agreement with Verizon. Under the agreement, Verizon bills and collects from our customers who have not yet migrated to our billing systems. These remaining customers, who are also Verizon local telephone customers, consist primarily of smaller customers serviced by our telephone call center.

> In 2003, in order to reduce our bad debt expense, we implemented a new credit and collections program, which resulted in more stringent policies, process reengineering and system improvements. By the end of 2004, some aspects of the program were implemented. These initial efforts helped reduce our bad debt expense as a percent of total operating revenue from 8.1% in 2003 to 6.6% in 2004. During 2005, we continued to implement additional new processes, which further reduced our bad debt expense as a percent of total operating revenue to 4.9% in 2005. In 2006, these enhancements were fully implemented and our bad debt expense as a percent of total operating revenue was 4.3%.

> Because most directories are published on 12-month cycles, we bill most of

our customers, many of which are small or medium-sized businesses, over the course of that 12-month period. Fees for national advertisers are typically billed upon issue of each directory in which advertising is placed by CMRs, after deduction of commissions. Because we do not usually enter into contracts with our national advertisers, we are subject to the credit risk of CMRs on sales to those advertisers, to the extent we do not receive fees in advance.

We manage collection of accounts receivable by conducting initial credit checks of new customers (under certain circumstances) and, where appropriate, requiring personal guarantees from business owners. We check all new orders from existing customers for payments that are past due to us prior to publishing the new order.

When applicable, based on our credit policy, we use both internal and external data to decide whether to sell to a prospective customer. In some cases, where appropriate, we may also require the customer to prepay part or all of the amount of its order.

Beyond efforts under certain circumstances to assess credit risk, we employ well-developed collection strategies using an integrated system of internal, external and automated means to engage with customers concerning payment obligations.

42.     On May 11, 2007, the Debtor Idearc filed its Form 10-Q for the quarterly period ended March 31, 2007 with the SEC (the "March 31, 2007 Form 10-Q").  This document, which was signed by Defendants Harless and Coticchio, incorporated the above specified representations regarding the Debtor Idearc's "Billing and Credit Control" that appeared

ADVERSARY COMPLAINT

in the 2006 Form 10-K by reference by stating:

> "These interim financial statements do not contain all information and
> footnote disclosures normally included in financial statements prepared in
> accordance with accounting principles generally accepted in the United
> States, and should be read in conjunction with our Annual Report on Form
> 10-K for the year ended December 31, 2006."

43.     The March 31, 2007 Form 10-Q reported continued improvement in the Debtor
Idearc's bad debts as a result of the Debtor Idearc's "stringent" policies, process
re-engineering and credit/collection system improvements stating that "[b]ad debt
expense as a percentage of revenue was 4.0% and 4.4% for the three months ended
March 31, 2007 and 2006, respectively."

44.     On August 10, 2007, the Debtor Idearc filed its Form 10-Q for the quarterly period
ended June 30, 2007, with the SEC (the "June 30, 2007 Form 10-Q"). This document,
which was signed by Defendants Harless and Coticchio, incorporated the above specified
representations regarding the Debtor Idearc's "Billing and Credit Control" 2006 that
appeared in the 2006 Form 10-K by reference by stating:

> "These interim financial statements do not contain all information
> and footnote disclosures normally included in financial statements prepared
> in accordance with accounting principles generally accepted in the United
> States, and should be read in conjunction with our Annual Report on Form
> 10-K for the year ended December 31, 2006."

45.     The June 30, 2007 Form 10-Q strongly inferred that the Debtor Idearc's
stewardship over its credit function had kept the level of bad debts to the 4% figure which

was reported at March 31, 2007, stating that "[b]ad debt expense as a percentage of revenue was 4.0% and 4.5% for the six months ended June 30, 2007 and 2006, respectively."

46. Moreover, the June 30, 2007 Form 10-Q reported a favorable change in bad debts in terms of dollars written off, stating:

> "Bad debt expense of $32 million for the three months ended June 30, 2007 decreased by $4 million, or 11.1%, compared to $36 million for the three months ended June 30, 2006 . . . . Bad debt expense of $64 million for the six months ended June 30, 2007 decreased by $8 million, or 11.1%, compared to $72 million for the six months ended June 30, 2006."

47. The June 30, 2007 Form 10-Q contained certifications signed by Defendants Harless and Coticchio which stated in relevant part:

> (a) "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

> (b) I have "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation."

48. Unbeknownst to the public, the June 30, 2007 Form 10-Q was materially false and

misleading because it failed to disclose that the Debtor Idearc had relaxed its credit policy in order to enable the Debtor Idearc to report increased revenue, and that it would take a year or longer for the extent of the adverse consequences of this action to become known. Disclosure of this critical change in credit policy was required by SEC regulations, and the June 30, 2007 Form 10-Q failed to contain the required disclosure and/or failed to disclose material facts necessary to make the statements made in the June 30, 2007 Form 10-Q, in light of the circumstances under which such statements were made, not misleading.

49.    On November 11, 2007, the Debtor Idearc filed its Form 10-Q for the quarterly period ended September 30, 2007, with the SEC (the "September 30, 2007 Form 10-Q"). This document, signed by defendants Harless and Coticchio, incorporated the above specified representations regarding the Debtor Idearc's "Billing and Credit Control" that appeared in the 2006 Form 10-K by reference by stating:

> "These interim financial statements do not contain all information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States, and should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2006."

50.    The September 30, 2007 Form 10-Q stated the following concerning the Debtor Idearc's receivables:

> Our primary source of funds continues to be cash generated from operations. Net cash provided by operating activities of $334 million for the nine months ended September 30, 2007 decreased $460 million, compared to $794 million for the nine months ended September 30, 2006, primarily

due to interest payments on debt incurred and separation costs associated with our spin-off from our former parent and an anticipated one-time increase in accounts receivable resulting from our decision to shift billing from Verizon to our own direct billing platform. In the past, amounts billed and collected by Verizon were received well in advance of normal customer payment experience. Now that we are direct billing all customers, the new higher account receivable balance represents actual customer collection experience. These unfavorable items are partially offset by lower income tax payments and other working capital items.

51.     Discussing bad debts, the September 30, 2007 Form 10-Q stated that "[b]ad debt expense as a percentage of revenue was 4.6% and 4.2% for the nine months ended September 30, 2007 and 2006, respectively." However, the September 30, 2007 Form 10-Q failed to disclose the relaxation of the credit policies that were effected in order to enable the Debtor Idearc to report increased revenue, or the imminent adverse consequences (decreased future earnings and liquidity) thereof. Accordingly, the September 30, 2007 Form 10-Q was materially false and misleading.

52.     The September 30, 2007 Form 10-Q contained certifications signed by Defendants Harless and Coticchio, which were substantially identical to the certifications that appeared in the June 30, 2007 Form 10-Q.  The September 30, 2007 certifications were materially false and misleading because the September 30, 2007 Form 10-Q failed to disclose material facts necessary to make the statements made in the September 30, 2007 Form 10-Q, in light of the circumstances under which such statements were made, not misleading.

53.     In addition, as described above, unbeknownst to plaintiff, the MD&A contained within the Debtor Idearc's September 30, 2007 Form 10-Q failed to comply with the

MD&A requirements because it failed to disclose the change in the Debtor Idearc's credit policies that were effected in order to enable the Debtor Idearc to report additional revenue, and the resultant adverse future ramifications (decreased future earnings and liquidity) thereof.

54.     On November 27, 2007, the Debtor Idearc announced it named Defendant Jones as acting chief financial officer and treasurer, replacing defendant Coticchio.

55.     On February 7, 2008, the Debtor Idearc announced its results for the fourth quarter and year ended December 31, 2007.  As explained by The Dallas Morning News,

> Disappointing fourth-quarter sales and a weak 2008 outlook sent shares of yellow pages publisher Idearc Inc. down 24 percent Thursday.
>
> Shares of the Grapevine-based company fell $3.66 to $11.56.
>
> The Company's fourth-quarter earnings of 68 cents a share actually beat consensus estimates by 4 cents, but the $787 million revenue fell $4 million short of expectations.
>
> During a conference call Thursday morning, company executives predicted that "cyclical economic headwinds" would hinder 2008 revenue.
>
> Company officials could not be reached for comment about the stock's fall. Analysts blamed declining print sales and the prospect of declining margins.
>
> "The decline in print sales seems to be accelerating," said Jeffrey Shelton, an analyst at Natexis Bleichroeder in New York. "And the margins aren't as good online."
>
> Idearc, a Verizon Corp. spinoff that publishes yellow pages and related products, made $100 million, or 68 cents a share, on revenue of $787

million during the three months ended Dec. 31. For the same period in

2006, it made $107 million, or 73 cents a share, on revenue of $801 million.

In describing the results during the earnings call, company officials

mentioned several areas for improvement but otherwise expressed

satisfaction.

"Our 2007 performance was in line with our expectations," said CEO

Kathy Harless, who noted that fourth-quarter profit was actually up when

spinoff costs and other nonrepeating expenses are excluded.

By those measurements, profit rose to 75 cents a share.

The Debtor Idearc boosted online revenue by 19 percent from the fourth

quarter of 2006, not enough to offset print revenue losses, but a good sign

for management's Internet transition strategy.

The sagging economy will probably hurt performance, but executives say

Idearc is well positioned for the long run. The firm has been aggressively

expanding both the number and the power of its online properties.

For example, Idearc has recently let advertisers add video to their online

profiles.

56.     On February 11, 2008, Standard & Poor's Ratings Services lowered Idearc's

outlook to negative from stable due to economic worries.

57.     On February 19, 2008, Idearc announced the appointment of its Chairman, John J.

Mueller, to the additional role of CEO.  Effective immediately, Mr. Mueller replaced

Defendant Harless.

58.     On February 27, 2008, Mr. Mueller resigned as Chairman and CEO for unforeseen

health reasons.  The Debtor Idearc appointed Defendant Gatto as interim CEO.

59.     On February 29, 2008, the Debtor Idearc filed its Form 10-K for the year ended December 31, 2007 with the SEC (the "2007 Form 10-K"). The 2007 Form 10-K was signed by Defendants Gatto, Jones and Harless and disclosed an increase in bad debts which the Debtor Idearc attributed to the "economic downturn [. . .] we are currently experiencing":

> As of December 31, 2007, approximately 83.9% of our print directory advertising revenues were derived from selling advertising to local businesses, which are generally small-and medium-sized businesses. In the ordinary course of our directory operations, we bill most of these customers over the course of a 12-month period. Full collection of delinquent accounts can take many months or may never occur. For 2007, bad debt expense represented approximately 5.0% of our net revenue, an increase from 4.3% in 2006. Small and medium-sized businesses tend to have fewer financial resources and higher rates of failure than larger businesses, in particular during periods of economic downturn, such as we are currently experiencing. These factors increase our exposure to delinquent accounts by our customers.

60.     The 2007 Form 10-K failed to disclose the relaxation of the credit policies that were affected in order to enable the Debtor Idearc to report increased revenue, or the imminent adverse consequences (decreased current and future earnings and liquidity) thereof. Accordingly, the 2007 Form 10-K was materially false and misleading.

61.     The 2007 Form 10-K contained certifications signed by defendants Gatto and Jones which were substantially identical to the certifications that appeared in the June 30, 2007 Form 10-Q. These certifications were materially false and misleading because, as specified above, the 2007 Form 10-K failed to disclose material facts necessary to make

the statements made in the 2007 Form 10-K, in light of the circumstances under which such statements were made, not misleading.

62.    In addition, as described above, unbeknownst to plaintiff, the MD&A contained within the Debtor Idearc's 2007 Form 10-K failed to comply with the above specified MD&A requirements because it failed to disclose the change in the Debtor Idearc's credit policies that were effected in order to enable the Debtor Idearc to report additional revenue, and the resultant adverse future ramifications (decreased current and future earnings and liquidity) thereof.

63.    On March 27, 2008, Defendant Jones informed investors that Idearc's underlying business fundamentals were sound:

Idearc Inc.'s acting chief financial officer, Samuel "Dee" Jones, presenting at the Credit Suisse 2008 Global Leveraged Finance Conference in Scottsdale, Az., told investors that the Debtor Idearc's underlying fundamentals and long-term prospects are unchanged.

> "The set of assets that made this business an attractive investment are still there, still sound and still solid," Mr. Jones said.
> The acting CFO also gave the audience additional detail around Idearc's revenue guidance that was provided earlier in the year. "Our view of 2008 is such that we anticipate mid-single digit percentage point declines in multi-product amortized revenue. And, as previously communicated, we anticipate some operating margin contraction due to the mix shift in revenues."
> Mr. Jones made it clear that he does not foresee any near-term liquidity issues for the Debtor Idearc. Regarding capital allocation, Mr. Jones told investors that the Idearc Board of Directors has decided to eliminate

payment of dividends as part of the current capital allocation program and focus on improving the Debtor Idearc's risk profile.

"This approach allows us to maximize flexibility as we work our way through a more challenging economic environment," Mr. Jones explained. "While the Board certainly has the discretion to resume paying dividends in the future, it is keenly focused on an appropriate capital allocation program and risk profile for the enterprise. In light of current market conditions, we firmly believe this is the most financially prudent approach to capital allocation."

Mr. Jones also told conference attendees that local media, and directional media in particular, continues to be a large and growing market. He said the Debtor Idearc has a number of initiatives in place to help mitigate the impact from current cyclical economic headwinds and the objective is to protect Idearc's customer base.

"We are managing our print business with opportunities to improve performance as we move through 2008. We are confident the multi-platform strategy will bring long-term value to stockholders, sales leads to advertisers and relevant local results to consumers," he concluded.

64.     On March 28, 2009, the Associated Press ran a story titled "Idearc shares down after dividend cut," which stated in relevant part:

    Shares of Idearc Inc. fell Friday after the yellow page publisher said it will eliminate dividend payments and an analyst forecast lower revenue.
    The stock fell 70 cents, or 15.4 percent, to $3.86.
    Goldman Sachs analyst Peter M. Salkowski said that while the dividend cut announced earlier this week is important, the biggest news is the challenging environment in which the Dallas-based company operates.

Print ad sales will likely dip 9 percent to 10 percent this year, and the Debtor Idearc may choose to build cash reserves despite that fact that debt repayment is a high priority, he said.

Salkowski cut his 2008 earnings outlook to $2.63 per share from $2.75 per share, previously. Analysts polled by Thomson Financial expect, on average, higher earnings of $2.67 per share.

Salkowski rates shares "Neutral" and has a $4 price target.

65.     On May 6, 2008, the Debtor Idearc issued a press release announcing its financial results for the three months ended March 31, 2008, which quoted Defendant Gatto as stating:

"The economic softness that began in the latter half of 2007 continues to impact our results and, while the first quarter proved to be challenging, we remain committed to our multi-product strategy, which we believe will ultimately maximize value to our investors."

66.     The Debtor Idearc's earnings and Defendant Gatto's statements had a positive effect on the market.  As reported by the Associated Press:

Yellow page publisher Idearc Inc. said Tuesday its first-quarter earnings rose 8 percent to beat Wall Street forecasts, as the Debtor Idearc reduced expenses to counter a drop in print products revenue.

Idearc shares surged 63 cents, or 18.6 percent, to $3.96 in morning trading. The stock has dropped from a 52-week high of $38 last August to reach a low of $3.11 on April 30.

67.     By the end of the day, the Debtor Idearc's shares had jumped $1.52, or 45.7%, to close at $4.85 per share.

68.     Defendant Gatto's remarks were materially false and misleading because Defendant Gatto failed to disclose the change in the Debtor Idearc's credit policies that were effected in order to enable the Debtor Idearc to report additional revenue, and the resultant adverse ramifications (decreased earnings and liquidity) that the change in the Debtor Idearc's credit policies had on the Debtor Idearc's reported earnings for the three months ended March 31, 2008, and would continue to have on subsequent periods.

69.     On May 8, 2008, the Debtor Idearc filed its Form 10-Q for the quarterly period ended March 31, 2008, with the SEC (the "March 31, 2008 Form 10-Q"). This document, which was signed by Defendants Gatto and Jones, incorporated the above specified representations regarding the Debtor Idearc's bad debts that appeared in the 2007 Form 10-K by reference by stating:

> "These interim financial statements do not contain all information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States, and should be read in conjunction with our Annual Report on Form 10-K for the year ended December 31, 2007."

70.     The March 31, 2008 Form 10-Q disclosed a sharp increase – $7 million, or almost 22% – in bad debts, without disclosing the fact that the sharp increase was due to the relaxation of the credit policies that were effected in order to enable the Debtor Idearc to report increased revenue, and without disclosing the resultant current and future adverse consequences (decreased earnings and liquidity) of the relaxed credit policies. Accordingly, the March 31, 2008 Form 10-Q was materially false and misleading.

71.     The March 31, 2008 Form 10-Q Form 10-Q contained certifications signed by defendants Gatto and Jones, which were substantially identical to the above discussed certifications that appeared in the June 30, 2007 Form 10-Q. These certifications were materially false and misleading because, as specified above, the March 31, 2008 Form 10-Q failed to disclose material facts necessary to make the statements made in the March 31, 2008 Form 10-Q, in light of the circumstances under which such statements were made, not misleading.

72.     In addition, as described above, unbeknownst to plaintiff,  the MD&A contained within the Debtor Idearc's March 31, 2008 Form 10-Q failed to comply with the above specified MD&A requirements because it failed to disclose the change in the Debtor Idearc's credit policies that were effected in order to enable the Debtor Idearc to report additional revenue, and the resultant adverse future ramifications (decreased earnings and liquidity) thereof.

73.     On June 2, 2008, the Debtor Idearc announced the appointment of Defendant Klein as CEO.  Defendant Gatto, who had served as interim CEO since February 27, 2008, resumed his position as Executive Vice President – Operations.

74.     On July 29, 2008, the Debtor Idearc issued a press release announcing its financial results for the three months and six months ended June 30, 2008.  The Debtor Idearc reported net income of $76 million for the second quarter 2008, a decrease of 30.3% versus the same period in 2007, and the Debtor Idearc reported a six month net income of $187 million, an 11.8% decrease compared to the same period in 2007.

75.     On July 29, 2008, the Debtor Idearc also held a conference call during which the following dialogue took place:

Unidentified Analyst: Hi, I want to make sure I had a better understanding of the increase in expenses in the quarter on the G&A line. Is it ... the increase in 20 ... of about 21 million or so for the quarter, is that almost exclusively bad debt related? Is that what you were saying before Dee?

Dee Jones -- Acting Chief Financial Officer, Senior Vice President Investor Relations: Yes, as I said, the vast majority of it is the increase in the bad debt provision along with some collection costs and outside collection agency fees that we also incurred in showing up our crediting and collection activities. There was also some srnall amount of timing around the couple of items that we did incur in the second quarter but the vast majority of it was the bad debt.

Unidentified Analyst: Okay. On the margins, great. And this rather dramatic increase in bad debt from a year ago, obviously there . . . the economy is not great out there. But is this partially your credit practices or are there many customers that were bad debt and how you're going to be able to grow your revenue if that many customers that are not paying, I guess, is sort of the other concern?

Scott Klein, Chief Executive Officer: Yes Bob, it's Scott. Quite simply, our credit practices a year ago were not what they should have been. The credit policy was not as tight as it needed to be.
And as is the nature of our business, it will take some time for some of those mistakes that were made to work their way through the system. But rest assured our credit policy is appropriate today and is as tight as it should be. And our credit and collections team is all over this having put in place some very new and creative ways to perhaps collect money that much more

quickly.

Unidentified Analyst: So do you perceive bad debt remaining in that 6% range for the balance of the year? Or is it . . . or should we start to see those improvements already in the second half of the year?

Dee Jones - Acting Chief Financial Officer, Senior Vice President Investor Relations: Yes, as you know with bad debt and that aspect of things, it does take time to impact things. I think the year-to-date rate at 5.7 will continue to assess and watch our writeoff rates with respect to that. As I did mention, the second quarter did see a step-up in the write-off rates but in that range of the 5.7, 6.26 is what we're kind of looking at. We'll continue to assess as we look through the remainder of the year.

76.    The disclosure of the Debtor Idearc's credit policy "mistakes" and their adverse impact on the Debtor Idearc's second quarter earnings as well as their anticipated adverse impact on subsequent quarters had a immediate and decisive effect on the price of the Debtor Idearc's stock.  The price dropped 40% with an unprecedented volume of 23,659,000 shares traded.

77.    The Dallas Morning News reported that "Idearc Revenue misses mark; value plummets 40%:"

Disappointing second-quarter earnings sent shares of Idearc Inc. tumbling Tuesday.
The Grapevine-based publisher of Yellow Pages lost 40 percent of its value soon after announcing that second-quarter profit fell 30 percent to $76 million or 52 cents a share,

Those earnings were well short of the 68 cents per share predicted, on average, by analysts surveyed by Thomson Reuters.

Operating revenue of $759 million was $5.4 million below expectations and $46 million less than the revenue from last year's second quarter.

The 6.6 percent decline in Idearc's print revenue more than offset the 2.7 percent increase in its Internet revenue.

The 2-year-old Verizon spinoff saw its stock fall 88 cents to $1.32.

"It is clear that we have not made the leap from operating as a division of Verizon to being a stand-alone public company. You will see us catch up quickly," said chief executive Scott Klein.

78.     On August 11, 2008, the Debtor Idearc filed its Form 10-Q for the quarterly period ended June 30, 2008 with the SEC (the "June 30, 2008 Form 10-Q"). It reported:

Bad debt expense of $48 million for the three months ended June 30, 2008, increased by $16 million, or 50.0%, compared to $32 million for the three months ended June 30, 2007. The increased bad debt expense was influenced by the current weak economic environment, as well as a temporary relaxation of certain aspects of the Debtor Idearc's credit policy in mid-2007 associated with the transition of billing activities from Verizon. Bad debt expense as a percent of total operating revenue was 6.3% for the three months ended June 30, 2008 compared to 4.0% for the three months ended June 30, 2007.

Bad debt expense of $87 million for the six months ended June 30, 2008, increased by $23 million, or 35.9%, compared to $64 million for the six months ended June 30, 2007. The increased bad debt expense was influenced by the current weak economic environment, as well as a temporary relaxation of certain aspects of the Debtor Idearc's credit policy

in mid-2007 associated with the transition of billing activities from Verizon.
Bad debt expense as a percent of total operating revenue was 5.7% for the
six months ended June 30, 2008 compared to 4.0% for the six months
ended June 30, 2007.

79.     The June 30, 2008 Form 10-Q Form 10-Q contained certifications signed by
defendants Klein and Jones, which were substantially identical to the above discussed
certifications that appeared in the June 30, 2007 Form 10-Q. These certifications were
materially false and misleading because, as specified above, the June 30, 2008 Form 10-Q
failed to disclose material facts necessary to make the statements made in the June 30,
2008, in light of the circumstances under which such statements were made, not
misleading.

80.     In addition, as described above, unbeknownst to plaintiff, the MD&A contained
within the Debtor Idearc's June 30, 2008 Form 10-Q failed to comply with the above
specified MD&A requirements because it failed to disclose that the change in the Debtor
Idearc's credit policies that were effected in order to enable the Debtor Idearc to report
additional revenue had had, and would continue to have, a material impact on subsequent
quarters' liquidity.

81.     On October 30, 2008, the Debtor Idearc held a conference call during which the
following dialogue took place:

        Jones: Yeah, as I said when I was going through the early part of the call,
        we are feeling more pressure on the margins side relative to the bad debt
        issue and the bad debt activities that we are seeing. As I noted the provision
        rate for the third quarter was about 8.2% for bad debt, the year-to-date level
        is at 6.5. And so we are seeing additional pressure on margins as we look at

through the remainder of the year, associated with that activity.

Andrew Finkelstein: Okay. And do you think that the 8.8% plus charge-off rate is going higher, as you look at in your fourth quarter and can you talk about payment collections activity there?

Jones: Well I would say that you know, the 8.2% in the third quarter, we haven't seen significant change as yet, it's a little early to tell with respect to the fourth quarter and what the economics are that we end up dealing with. So we are feeling more pressure there. It's just a little bit too early to tell exactly where it's going to head in the fourth quarter.

82.    The disclosure of the Debtor Idearc's run-away bad debts and the ominous admission by management that they could not tell "where it's going to head" had an immediate and decisive effect on the price of the Debtor Idearc's stock which dropped 36% in heavy trading.

83.    Although certain partial disclosures were made, Defendants knew or recklessly failed to know and failed to disclose that bad debts for the year would approximate 7% and that the adverse ramifications of the non-collection of tens of millions of dollars of receivables had had and would continue to have, a materially adverse impact on the Debtor Idearc's liquidity.

84.    On November 6, 2008, the Debtor Idearc filed its Form 10-Q for the quarterly period ended September 30, 2008 with the SEC (the "September 30, 2008 Form 10-Q"). It reported:

Bad debt expense of $60 million for the three months ended September 30, 2008, increased by $13 million, or 27.7%, compared to $47 million for the three months ended September 30, 2007. The increased bad debt expense was influenced by the current weak economic environment, as well as the continuing effect of a temporary relaxation of certain aspects of our credit policy in mid-2007 associated with the transition of billing activities from Verizon. Bad debt expense as a percent of total operating revenue was 8.2% for the three months ended September 30, 2008 compared to 5.9% for the three months ended September 30, 2007. Our bad debt has increased over the past several quarters, both in dollar amount and as a percentage of revenue.

Given the current economic environment, our bad debt could continue to increase.

Bad debt expense of $147 million for the nine months ended September 30, 2008, increased by $36 million, or 32.4%, compared to $111 million for the nine months ended September 30, 2007. The increased bad debt expense was influenced by the current weak economic environment, as well as a temporary relaxation of certain aspects of our credit policy in mid-2007 associated with the transition of billing activities from Verizon.

Bad debt expense as a percent of total operating revenue was 6.5% for the nine months ended September 30, 2008 compared to 4.6% for the nine months ended September 30, 2007. Our bad debt has increased over the past several quarters, both in dollar amount and as a percentage of revenue. Given the current economic environment, our bad debt could continue to increase.

85. The September 30, 2008 Form 10-Q Form 10-Q contained certifications signed by defendants Klein and Jones, which were substantially identical to the above discussed

certifications that appeared in the June 30, 2007 Form 10-Q. These certifications were materially false and misleading because, as specified above, the September 30, 2008 Form 10-Q failed to disclose material facts necessary to make the statements made in the September 30, 2008 Form 10-Q, in light of the circumstances under which such statements were made, not misleading.

86.    In addition, as described above, unbeknownst to plaintiff, the MD&A contained within the Debtor Idearc's September 30, 2008 Form 10-K failed to comply with the above specified MD&A requirements because it failed to disclose that the change in the Debtor Idearc's credit policies that were effected in order to enable the Debtor Idearc to report additional revenue had had, and would continue to have, a material impact on subsequent quarters' liquidity.

87.    On November 21, 2008, the Debtor Idearc announced that its stock was trading over the counter under the trading symbol of IDAR and stopped trading on the New York Stock Exchange (NYSE) at market close on Nov. 20.

88.    On March 12, 2009, the Debtor Idearc announced 2008 results in a press release stating
that the Debtor Idearc "Remains Focused on Strengthening Business and Balance Sheet." The press release continued, in relevant part:

>    "Idearc's fourth quarter financial results are disappointing as we expected," said Scott W. Klein, chief executive officer of Idearc Inc.  "We are making progress on our transformational and cost-cutting initiatives. However, the unprecedented economic challenges this nation is facing are creating never-before-seen obstacles for our clients and, as a result, for us as well."

\*      \*      \*

Update on Liquidity and Capital Structure

As of December 31, 2008, Idearc had cash and cash equivalents of $510 million. As previously reported, in October 2008, the Company borrowed $247 million under its existing $250 million revolving credit facility.

At December 31, 2008, the Company was in compliance with its quarterly leverage ratio covenant. However, based on current forecasts, the Company anticipates that it may be noncompliant with this covenant sometime in the first half of 2009. Additionally, because the December 31, 2008 financial statements the Company will provide to its lenders includes a report of its independent registered public accounting firm that contains an explanatory paragraph expressing doubt as to Idearc's ability to continue as a going concern, the Company will be noncompliant with a second covenant. Noncompliance with this covenant is considered an event of default under the senior secured facilities thirty days following notice of such default from the lenders. Upon an event of default, absent other potential remedies, the lenders may declare the total secured debt outstanding to be due and payable and upon acceleration, the Company's unsecured notes would also become due and payable.

Idearc has evaluated various options for restructuring its capitalization and debt service obligations to alleviate these covenant issues and to create a capital structure that will permit the Company to remain a going concern. Idearc and its advisors have considered various alternatives to strengthen its balance sheet and financial risk profile. Among these alternatives, the Company is currently considering a restructuring through a "pre-packaged," "pre-negotiated," or similar plan of reorganization under federal bankruptcy laws. Idearc and its advisors continue to work with representatives of

holders of both the senior secured facilities and the senior unsecured notes in this regard. If the Company is unable to achieve a "pre-packaged," "pre-negotiated," or similar plan of reorganization, it would likely be necessary that the Company file for reorganization under federal bankruptcy laws in any event.

"Simply stated, restructuring our capitalization and debt obligations to a more appropriate level will provide us with the opportunity to prosper and grow in the years ahead," Klein said. "We are dedicated to implementing an appropriate capital structure to support our new strategic business plans and objectives. A debt restructuring plan that will strengthen Idearc's financial condition will position the Company to compete more effectively in a challenging and rapidly evolving economic environment.

"We would expect the Company to operate as usual throughout the restructuring process and continue to meet its obligations to consumers, clients and employees, just as we do now and have done in the past."

89.    On March 12, 2009, the Company filed its Form 10-K for the year ended December 31, 2008 with the SEC (the "2008 Form 10-K"). This document which was signed by Defendant Klein, disclosed that the Debtor Idearc's bad debts had mushroomed to 6.9%, a number well above 5.7 to 6.26 range that defendant Dee Jones had disclosed on July 29, 2008.

For 2008, bad debt expense represented 6.9% of our net revenue, an increase from 5.0% in 2007. Small-and-medium-sized businesses tend to have fewer financial resources and higher rates of failure than larger businesses, in particular during periods of economic downturn, such as we are currently experiencing. These factors increase our exposure to delinquent accounts by our clients.

Bad debt expense of $206 million for the year ended December 31, 2008,
increased by $47 million, or 29.6% compared to $159 million for the year
ended December 31, 2007. The increased bad debt expense was influenced
by the current weak economic environment, as well as the continuing effect
of a temporary relaxation of certain aspects of our credit policy in mid-2007
associated with the transition of billing activities from Verizon.

Bad debt expense as a percent of total operating revenue was 6.9% for the
year ended December 31, 2008 compared to 5.0% for the year ended
December 31, 2007.

Our primary source of funds continues to be cash generated from
operations. Net cash provided by operating activities of $363 million in
2008 decreased $6 million, compared to $369 million in 2007, primarily
due to lower cash collections coupled with higher bad debt write-offs, and a
contract settlement with a former reseller of our advertising. These
unfavorable items were partially offset by reduced transition costs related to
our spin-off, lower income tax payments, as well as lower interest
payments.

* * *

Bad debt expense as a percentage of revenue was 6.9%, 5.0%, and 4.3%,
for the years 2008, 2007 and 2006, respectively.

90.    The 2008 Form 10-K was materially false and misleading because it failed to
disclose that the Debtor Idearc was on the verge of bankruptcy due to the relaxation of
the Debtor Idearc's credit policies during mid-2007.

91.    On March 31, 2009, Idearc announcing that the Company has initiated voluntary

Chapter 11 proceedings in a press release which stated, in part:

Idearc Inc. announced that the Company and its domestic subsidiaries today filed voluntary petitions for reorganization under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division. Idearc also announced that it has reached an agreement in principle with the agent bank and a steering group of its secured lenders on certain critical elements of a plan of reorganization. The Company expects to be able to file a plan of reorganization in approximately 30 days, and if implemented as proposed, this plan will enable Idearc to significantly reduce its outstanding debt to a more suitable level upon emergence from the legal proceedings.

Pursuant to the proposed plan, Idearc does not need nor intend to obtain debtor-in-possession (DIP) financing during the reorganization, as the Company maintains substantial cash balances and continues to generate positive cash flow, and has reached an agreement on use of cash collateral. Idearc expects to operate business as usual throughout its restructuring process, with no interruption in the solutions and services it provides to hundreds of thousands of clients around the nation.

"Today we take an important step forward as we continue to transform Idearc. Essentially we have a company with good potential being held back by a terminally ill balance sheet," said Scott W. Klein, chief executive officer of Idearc Inc. "We are not only open for business and serving our clients as usual, we are also continuing our focus on transforming Idearc for the future based on a bold strategy, including all of the new programs launched earlier this month.

"The reorganization process will enable Idearc to quickly finalize and implement a debt restructuring plan that will strengthen our financial

condition and position us to compete more effectively in a challenging and rapidly evolving economic environment," Klein said.

"One of our most important priorities is to put in place an appropriate capital structure to support our strategic business plans and objectives. A new capital structure that can give all of our partners the confidence they need in us to be there for them in the years ahead provides us with the greatest chance for success."

Under the agreement in principle with the agent bank and steering committee, the Company's total debt will be reduced from approximately $9 billion today to a pro forma level of $3 billion of secured bank debt, with a 12 percent interest rate and a six-year term. Mandatory amortization will be $60 million for each of the first two years following confirmation and $40 million per year thereafter. The Company will retain 32.5 percent of surplus cash flow, with the balance to be paid as additional amortization on the bank debt. At emergence from Chapter 11, the Company will have a cash balance of $150 million. Other terms of the plan are still to be negotiated, and it is anticipated that the remainder of the Company's bank debt and bonds will be converted to equity.

Also, the agent bank and steering committee have agreed with the Company to continue to fund operations from all but $250 million of Idearc's more than $600 million cash collateral balance. The remaining $250 million of cash collateral will be paid to the secured lenders as adequate protection, subject to bankruptcy court approval of the Company's motion to use the cash collateral.

Idearc has also filed a variety of other customary first day motions with the bankruptcy court to enable it to continue to conduct business as usual while it completes its reorganization. These include motions providing for employees to continue to receive compensation and benefits as usual and to

maintain customer programs and guarantees. Idearc expects to file a motion with the bankruptcy court shortly seeking to assume executory contracts related to its 30-year publishing agreement and 30-year branding agreement with Verizon Communications, Inc.

92.     As alleged herein, the Individual Defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Debtor were materially false and misleading; knew that such statements or documents would be issued or disseminated to the public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Idearc, their control over, and/or receipt and/or modification of Idearc's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Idearc, participated in the fraudulent scheme alleged herein.

93.     During the relevant times the Individual Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Idearc securities and operated as a fraud or deceit on creditors by failing to disclose the material adverse facts detailed herein. As a result of their extension of credit, plaintiff and the other unsecured creditors suffered economic loss, i.e., damages.

94.     By failing to disclose the material facts detailed herein, the Individual Defendants presented a misleading picture of Idearc's business and prospects. The Individual Defendants' false and misleading statements had the intended effect and caused otherwise diligent creditors to not otherwise investigate and execute.

95.     The statutory safe harbor provided for forward-looking statements under certain
circumstances does not apply to any of the allegedly false statements pleaded in this
Complaint.  Many of the specific statements pleaded herein were not identified as
"forward-looking statements" when made.  To the extent there were any forward-looking
statements, there were no meaningful cautionary statements identifying important factors
that could cause actual results to differ materially from those in the purportedly
forward-looking statements.  Alternatively, to the extent that the statutory safe harbor
does apply to any forward-looking statements pleaded herein, defendants are liable for
those false forward-looking statements because at the time each of those forward-looking
statements were made, the particular speaker knew that the particular forward-looking
statement was false, and/or the forward-looking statement was authorized and/or
approved by an executive officer of Idearc who knew that those statements were false
when made.

Count One

For Equitable and Statutory Subrogation

(Against Defendants Chase and Verizon)

        Pursuant to 11 USC 502(a), 509 (c) -"Secured Credit Facilities" loans and any
other claims of Verizon insiders to those of damages suffered by Sean Ryan are
subrogated to the claims of Sean Ryan.

96.     This Court has jurisdiction over this adversary claim pursuant to 28 U.S.C. §§ 157
and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper in this
District pursuant to 28 U.S.C. §§ 1408 and 1409.

97.     Sean Ryan was employed by Defendant Verizon, as set forth above.   Sean Ryan's
claim arose according to California law, within the State of California.   The Court must
recognize the validity of that claim against Defendant Verizon and Debtor Idearc herein,

ADVERSARY COMPLAINT

providing full faith and credit to the California Court that issued the judgment.

98.     Defendant Verizon is a codebtor to Debtor Idearc in that Sean Ryan never agreed to allow the liability owed by Verizon to be transferred to Debtor Idearc.

99.     Defendant Verizon and Chase received money from Debtor Idearc, as insiders of Debtor, with constructive, if not actual notice of the existence of Sean Ryan's claim by virtue of the filing of his lawsuit against Verizon Directories Sales-West, Inc., a Delaware corporation.

Count Two

(Against Defendants Chase and Verizon)

Pursuant to 11 USC 502(a), 510 (c) -"Secured Credit Facilities" loans and any other claims of Verizon and its insiders to those of damages suffered by Sean Ryan are subordinate to the claims of Sean Ryan.

100.    This Court has jurisdiction over this adversary claim pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

101.    During the course of the action, counsel for Verizon and Idearc failed to disclose the nature of the spinoff of Idearc, citing that "only the name of the corporate entity has changed." (Declaration of Theresa Murray dated August 23, 2007)  Further, Debtor has suggested by assertion of the automatic stay in the Court of Appeals in the State of California, for the Fourth District, Division One, Case No.'s D053060 and No. D054166, that the collection of that obligation is barred by the instant bankruptcy proceedings.

102.   On March 31, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy cases (collectively, the  "Cases").  The Debtors continue in the management and possession of their businesses and property as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.   Plaintiff is informed and believes that Defendant Chase is dominating the administration by the Debtor and its counsel, of the present bankruptcy.

103.   On the Petition Date, the Debtors were subject to that certain Credit Agreement dated as of November 17, 2006 (as amended, supplemented or otherwise modified, the "Credit Agreement"), among Idearc, the lender parties thereto (the "Lenders") and JPMorgan Chase Bank, N.A., as administrative agent for the Lenders (in such capacity, the "Agent"), and the other collateral and ancillary documentation executed in connection therewith (as amended, supplemented or otherwise modified, the "Loan Documents").

104.   Among the first day motions filed on the Petition Date, the Debtors filed the Motion for Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection to Lenders, and (C) Scheduling Final Hearing (the "Cash Collateral Motion").

105.   On April 8, 2009, the Debtor filed a suggestion of Bankrupty in the Court of Appeals for the State of California, Division One, Case No.'s D053060, D054166, entitled *Ryan v. Idearc Media Sales - West, Inc*.  Prior to that filing Plaintiff Sean Ryan and his lawyers were entirely ignorant of the Debtor's insider's intention to put the Debtors into bankruptcy.  Indeed, the Plaintiff and his lawyers had understood from market information intentionally published by Defendant Verizon and its officers and directors, that Debtor Idearc was doing well.

106.   On April 13, 2009, the United States Trustee appointed the Official Creditors Committee.   Although, with the size of the claim of Sean Ryan and his lawyer's attorney fee award, Mr. Ryan should have been considered for selection on the creditors committee as one of the top 50 unsecured creditors, the Debtor's counsel did not list an amount with Sean Ryan's claim.  Sean Ryan was not invited by the U.S. Trustee to participate in the Committee.   Plaintiff Ryan is informed and believes, and based thereon alleges, that the Debtor's failure to list the Ryan judgment was intentional, and those actions were consistent with the efforts of the insider defendants to isolate Sean Ryan's judgment in the now defunct and always insolvent Debtor Idearc.


107.   On May 11, 2009, Sean Ryan's lawyer Evan A. Kalooky appeared at the 341a creditors meeting and attempted to inquire into the circumstances of the bankruptcy and the preparation of the bankruptcy petition documents.   The Debtor's representative was improperly instructed not to answer some of Mr. Kalooky's questions relating to the Debtor's representative's investigation prior to signing the bankruptcy petition.


108.   Through the Official Creditor Committee's disclosure of its review of the Lenders' liens, Creditor Ryan recently discovered that the Lenders failed to perfect their liens in the Debtors' registered copyrights and the advertising revenues derived from the copyrights ("Protected Materials") by failing to file a copyright security agreement with the United States Copyright Office ("Copyright Office")[1] .  According to the OCC, there

---

[1] Section 3.18 of the Credit Agreement (quoted in part below) contemplates filings with the copyright office, and  acknowledges that such filings are necessary to perfect the liens: (b) When the Collateral Agreement or a summary thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral composed of Intellectual Property in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in paragraph (a) above, the Collateral Agent shall have, for the ratable benefit of the Secured Parties, a perfected security interest in, all right, title and interest of the

are 1,188 unencumbered copyrights that were registered by Idearc and potentially tens of thousands of copyrights that were registered by Verizon that presumably are now owned by Idearc. The Debtors have neither disclosed to the Committee or the general unsecured creditor body, the full extent of their registered copyrights.

110.    It is well-settled law that security interests in registered copyrights and in the proceeds thereof can be perfected only by the filing with the Copyright Office of a copyright security agreement identifying each copyright by registration number. In re Peregrine Entm't Ltd., 116 B.R. 194 (C.D. Cal. 1990). One of the consequences of the Lenders' failure to file a copyright security agreement with the Copyright Office, therefore, is that the Lenders have no perfected security interest in either the Protected Materials or the advertising revenues recognized upon the publication of such materials.

111.    Presumably, the Debtors will contend that the revenues earned by the company upon the dissemination of its directories are not part of, derived from, or proceeds of its copyright but, rather, that the revenue constitutes proceeds of the advertising contracts. If true, then the Lenders' collateral would extend only to proceeds of the advertising contracts that existed as of the Petition Date; § 552(a) would except from the Agent's liens the proceeds of the Debtors' post petition advertising contracts. 11 U.S.C. § 552(a). This too was not disclosed to the Court.

112.    In several other instances, the Debtors have stated that the Pre-Petition Obligations

---

Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations, in each case subject to no other Lien other than Liens permitted under Section 6.02, it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the date hereof.

are secured by substantially all of the Debtors' assets.

a)        "Idearc is indebted to a large syndicate of lenders in the
         aggregate outstanding principal amount of not less than
         $6,400,000,000 (plus accrued and unpaid interest) pursuant to
         a senior secured Credit Agreement (as amended,
         supplemented or otherwise modified, the "Senior Credit
         Facility"), dated as of November 17, 2006, among Idearc, the
         lenders from time to time parties thereto, and JPMorgan
         Chase Bank, N.A., as administrative agent for such lenders.
         The Senior Credit Facility consists of: (1) a Tranche A Term
         Loan Facility in the approximate outstanding principal
         amount of $1,515,000,000; (2) a Tranche B Term Loan
         Facility in the approximate outstanding principal amount of
         $4,655,000,000; and (3) a Revolving Credit Facility in the
         approximate outstanding principal amount of $250,000,000.
         The Senior Credit Facility is secured by substantially all of
         Idearc's present and after acquired assets, and is guaranteed
         on a secured basis by substantially all of Idearc's subsidiaries,
         including each of the Debtors herein."

Affidavit of Samuel D. Jones, Executive Vice President, Chief Financial Officer and
Treasurer of Idearc Inc., in Support of Chapter 11 Petitions and First Day Motions ("First
Day Affidavit") at  14.

b)        "Given the encumbrances upon substantially all of the
         Debtors' assets, the Debtors are unable to continue their
         business operations absent some form of immediate relief

from the Court."

First Day Affidavit at  31.

c)        "Approximately $7 billion of our debt is bank debt secured by
          liens, we believe and are prepared to admit, on virtually all of
          our assets, although our asses are primarily account receivable
          and cash."

First Day Transcript 13:14-17 (Debtors' counsel).

d)        "We have accumulated cash and have cash on our balance
          sheet available for operating capital and other uses
          somewhere north of, as of yesterday, $650 million. . . .  We
          believe the banks have good and valid prior liens on that
          cash."

First Day Transcript 18:24-19:6 (Debtors' counsel).

e)        ". . . [T]he exhibits also reflect the evidence of perfection of
          those liens, copies of the UCC finding and final financial
          statements and other evidence of perfection as necessary."
          First Day Transcript 40:11-14 (Debtors' counsel).

f)        "Those lenders are secured by substantially all of the debtor's
          assets." First Day Transcript 45:20-22 (Counsel for JPMorgan
          Chase).

g)  "But we are not aware of any unencumbered cash here.  It is possible that there is some real property that's owned that did not rise in value to the threshold required to be pledged to support all of the bank debt. "  First Day Transcript 52:16-19 (Counsel for JPMorgan Chase).

h)  "MR. FUHRMAN: Thank you, Your Honor. Steve Fuhrman, Simpson, Thacher and Bartlett, counsel to JPMorgan Chase, as agent for a syndicate, as you heard earlier, of just over 900 lenders under a credit agreement dated as of November 17, 2006.  Those lenders are secured by substantially all of the debtors' assets, including the cash that we've been discussing today.  They're owed approximately $6.42 billion. There are also about a dozen swap agreements that have been entered into with members of the bank group. And as a result of the affiliation of those lenders with the credit agreement, the companies' obligations in respect of those swaps are also secured on a pari passu basis with the bank debt. And that's what takes you to the approximate $7 billion number.  We anticipate those swaps to be terminated, presumably in the very near term, with the automatic stay not applying, and certainly in advance of confirmation of a plan. The agreed cash collateral order, as well as this $250 million payment, is really a critical element."

Transcript of Hearing May 7, 2009 45:25-46:9.

113.   All of these statements now appear to be substantially inaccurate.   The fact of the

inaccuracy, and the magnitude of its effect, bears on the issue of whether this filing was even made in "good faith."

114.    The granting of the Secured Lenders' liens constitutes a fraudulent transfer under applicable law.  Idearc entered into the Credit Agreement in connection with the November 2006 spin-off transaction in which Idearc was spun-off from Verizon.  See Debtors' Proposed Disclosure Statement with Respect to Joint Plan of Reorganization of Idearc, Inc., et al., Debtors (the "Disclosure Statement") [Docket No. 289] at Page 20. The Credit Agreement provided for an aggregate of $6.515 billion in debt, consisting of (i) a senior secured revolving credit facility of $250 million, (ii) a tranche A term loan facility of $1.515 billion and (iii) a tranche B term loan facility of $4.750 billion.  See Disclosure Statement at Page 20.  The Debtors pledged substantially all of their assets as collateral security for their obligations under the Credit Agreement.  See Disclosure Statement at Page 47; see generally Collateral Agreement.

115.    Although the Debtors granted the Secured Lenders a lien on substantially all of their assets to secure the Credit Agreement, the Debtors transferred a significant portion of the funds available under the Credit Agreement to Verizon.  See Disclosure Statement at Page 21.  In connection with the spin-off, the Debtors transferred to Verizon "a portion of the loans under the tranche B term loan facility," "proceeds of the term loans under the tranche A facility," and "proceeds from the remaining portion of the term loans under the tranche B facility."  See indebtedness.  See Disclosure Statement at 21.

116.    Under the Uniform Fraudulent Transfer Act ("UFTA") as adopted both by Texas and by Delaware:

> A transfer ... incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made, ... if the debtor made a transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code § 24.005(a) and Delaware Code Title 6 §1304.

117.    As Sean Ryan was a then existing creditor of Verizon in November of 2006, the transfer was fraudulent as to Plaintiff:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com. Code § 24.006 and Delaware Code Title 6 §1305

118.    The Debtors' granting of a security interest in all of the Debtors' assets to Chase constitutes a fraudulent transfer. Specifically, the Debtors failed to receive reasonably

equivalent value in exchange for the security interest guaranteeing Chase's Claim under the Credit Agreement because the Debtors contemporaneously transferred a significant portion of the funds available under the Credit Agreement to Verizon. See Disclosure Statement at 21. In addition, the spin-off transaction left the debtors with an unreasonably small amount of assets in relation to the Debtors' business, and in relation to the Debtors' $9.115 billion indebtedness. In connection with the spin-off, and under the Credit Agreement secured under the terms of the Collateral Agreement, the Debtors also incurred debts beyond the debtor's ability to pay as they became due, as evidenced by the fact that the Debtors were only able to operate for just over two years after the transaction before filing for bankruptcy.

119.    As set forth above, and on information and belief, Defendant Chase and the lenders it represents, were not only aware of the conduct of Verizon in over encumbering the Debtor Idearc, but were participants in the conduct.   Defendant Chase was aware of the disproportionate debt to the revenue and cash flow of the Debtor Idearc before it became involved with the transaction.

120.    Defendant Chase was aware of the motivations of Defendant Verizon in light of Defendant Verizon's public statements of intention to purge its balance sheet of debt. Defendant Chase, is presumably, aware of the accounting principle of the Conservation of Money, i.e., for every asset on a balance sheet there must be an adjustment to debt or equity, and that equity cannot be properly, and lawfully, created through a mere ledger entry.

121.    Defendant Chase's participation in the other Defendants scheme to offload debt onto an insolvent Debtor Idearc is inequitable conduct. Within the meaning of *In re Multiponics*, 622 F.2d 709 (5th Cir. 1980); *In the Matter of Mobile Steel Co.*, 563 F.2d

692, 700 (5th Cir. 1977);

*In re T. E. Mercer Trucking Co.*, 16 B.R. 176, 189 (Bankr. N.D. Tex. 1981).

122.    Recognition of a legitimate "security" interest held by Chase through the financing identified above will work an injustice upon Sean Ryan, as Chase gained this advantage by participation in the other defendants' breaches of fiduciary duty, and will profit therefrom.  The Court should disallow the security of Chase and subrogate to that of Sean Ryan.

Count Three

(Against Defendant Chase)

(11 USC § 502(a) of the Bankruptcy Code and FRBP 7001(2))

123.    Pursuant to Section 502(a) of the Bankruptcy Code and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), SEAN RYAN objects to the Secured Lenders' claim and seeks a determination of the validity, priority, and extent of the Secured Lenders' purported liens.

A.       The Secured Lenders Do Not Have a Perfected Security Interest in the Debtors' Registered Copyrights

124.    The Debtor Idearc owns nearly 1,200 registered copyrights (the "Copyrights"), which partially cover the printed directories from which Debtor primarily derive its revenue.  By its own admission, Chase doe not have a perfected security interest in the Copyrights.  See Response of JPMorgan Chase Bank, N.A., as Agent, to MatlinPatterson Global Opportunities Partnership III LP and MatlinPatterson Global Opportunities (Cayman) III LP's Motion to Reconsider Cash Collateral Order, filed July 10, 2009

[Docket No. 594] at ¶ 6 ("There is no dispute, and no one has ever denied, that the [Secured] Lenders did not perfect liens in the [C]opyrights . . . .").

125.     The only way to perfect a security interest in registered copyrights is to file a copyright security agreement identifying each copyright by registration number with the United States Copyright Office. The Secured Lenders have failed to make any filing with the United States Copyright Office with respect to the Copyrights.  Therefore, the Secured Lenders have failed to properly perfect their security interest in the Copyrights.


B.      The Secured Lenders Do Not Have a Security Interest in Various of the Debtors' Intellectual Property Contracts


126.    In addition, the Secured Lenders' lien does not extend to certain intellectual property contracts, which are key to the Debtors' business.  Certain of the Debtors are party to a Branding Agreement with Verizon Communications, Inc. and its affiliates ("Verizon"), under which the Debtors are authorized to use the Verizon brand name (the "Branding Agreement").  Certain of the Debtors are also party to a Listing License Agreement with Verizon, under which the Debtors are licensed certain intellectual property owned by Verizon (the "Listing License Agreement").  Debtor Idearc's public filings with the Securities and Exchange Commission make clear that the Branding Agreement and the Listing License Agreement are integral to Idearc's business.


127.    The Collateral Agreement provides that Chase's liens shall not attach to: (i) any contract, agreement, General Intangible, Instrument, Paper, or License (each a "Restrictive Agreement") to which any Grantor is a party or any of its rights or interests thereunder to the extent and for so long as the grant of the Security Interest shall constitute or result in


        (A) the unenforceability, abandonment or invalidation of any right of such

Grantor therein or

> (B) in (sic) a breach or termination pursuant to the terms of, or a default under, any such Restrictive Agreement . . . .

See Guarantee and Collateral Agreement at § 4.01(d).

128.    Both the Branding Agreement and Listing License Agreement contain such restrictions.  Section 2(c) of Idearc's Branding Agreement with Verizon provides that the Debtors' license to use the Verizon trademarks is non-transferrable, and Section 9.6 of the Listing License Agreement prohibits assignment "in whole or in part."  See Branding Agreement at Page 9, Section 2(c); Listing License Agreement at Page 8,  Section 9.6. Because the Branding Agreement and Listing License Agreement contain contractual restrictions on transfer, Section 9-203(b)(2) prevents a security interest from attaching to the these contracts or their proceeds.

C.      The Secured Lenders' Liens Do Not Attach to Property Acquired by the Debtors Post-Petition

129.    The Secured Lenders' liens do not extend to property the Debtors acquired post-petition.  Under Section 552(a) of the Bankruptcy Code, property acquired after the commencement of bankruptcy is not subject to prepetition liens.  The bankruptcy code does not allow an enforceable lien to be created on property that did not exist on the petition date or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt.

130.    Section 552(b) provides an exception to this general rule.  For a prepetition security interest to attach to property acquired by the debtor after the petition date, the

after-acquired property must be proceeds, product, offspring, rents, or profits of pre-petition property subject to

a prepetition lien.  Any new property interests acquired by the Debtor after the commencement of these bankruptcy cases does not constitute proceeds, product, offspring, rents, or profits of any prepetition property subject to liens and, as a result, the Secured Lenders' liens do not reach those property interests.  Nor does Chase's liens reach the proceeds generated from property the Debtor Idearc acquired post-petition.

D.       Recognition of the Chase's Liens violates the Absolute Priority Rule

131.    Placing Chase claims in priority to the claims of Sean Ryan violates the absolute priority rule.  The absolute priority rule originated as a "judicial invention designed to preclude the practice in railroad reorganizations of 'squeezing out' intermediate unsecured creditors through collusion between secured creditors and stockholders (who were often the same people)." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 463 (2d Cir. N.Y. 2007)[Involved yet another scheme where JP Morgan Chase financed a spin-off distribution].  The absolute priority rule has been codified as part of the "fair and equitable" requirement of 11 U.S.C. § 1129 (b). Under the statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan "on account of" such claims or interests. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); See, *In re Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. Del. 2005).

132.    The absolute priority rule requires that creditors are paid before equity holders. Chase holds stock pledged to it, and on information and belief can vote that stock. Defendant Chase directs who will serve on the board of directors, and who will search for potential board members and management.  Defendant Chase is by all intents and

purposes, an equity holder, and should only be paid after Plaintiff Ryan herein.

Count Four

(Against All Defendants)

(Breach of Fiduciary Duty)

133.    Plaintiff Sean Ryan is a creditor to Defendants Verizon and Debtor Idearc.   Sean Ryan and his agents were reasonably ignorant of the deceit, misconduct and tomfoolery, that all defendants had engaged in, such that the statute of limitations should be tolled for the claims of damages that have been caused by the defendants herein.

134.    Defendant Verizon and the individuals named above as defendants were officers, directors, and participants in the spin-off.  The individual defendants because of their positions with the Verizon and Idearc, possessed the power and authority to control whether Verizon looted Idearc, and then whether Idearc ratified the looting.  The individual defendants who are officers, and have been identified as making a statement participated overtly, were provided with copies of the Idearc's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Idearc, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The individual defendants who are not identified with a statement, were in a position as a Director of either Verizon or Idearc at the time that the spin-off was being concocted.

135.    Defendant Chase directed the conduct specified herein, and by the oppressive and dominant manner in controlling the Debtor, and with knowledge of the conduct of the other Defendants in their efforts to create money without providing consideration to Idearc, have participated in the looting of the company to the detriment of Sean Ryan,

and particularly to Sean Ryan, falsely represented throughout these proceedings that Debtor Idearc was the primary debtor as to his claim, rather than Defendant Verizon.

136.   Defendants, and each of them, owed duties of fairness and candor.  Defendants breached that duty in their conduct set forth above, and Plaintiff was damaged.

137.   Plaintiff requests imposition of an actual and constructive trust, an accounting, restitution of sufficient funds to pay the entire debt owed Sean Ryan, attorneys fees according to California Labor Code 218.6, interest, actual and punitive damages against all Defendants in light of the breaches of fiduciary duty detailed herein.

JURY DEMAND

138.   Plaintiff demands a trial by jury.

PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Awarding plaintiff damages in an amount of $1,000,000, and recognizing the superiority of his claim;

B.     Awarding plaintiff reasonable costs and attorneys' fees; and

C.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.


        Dated: July 13, 2009


                          The McMillan Law Firm, A.P.C.

                              /S/ SCOTT A. MCMILLAN

                      BY:   _____

                              Scott A.  McMillan

                              Attorneys for Party In Interest

                              Sean Ryan

## CERTIFICATE OF CONFERENCE

The undersigned certifies that on July 12, 2009, he conferred with counsel for the Debtors and that the Debtors oppose the relief sought herein.

/s/ Scott A. McMillan
Scott A. McMillan

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 13, 2009, a true and correct copy of the foregoing document was served upon all parties on the attached Master Service List via e-mail or United States first class mail, postage prepaid, as indicated, in accordance with the Federal Rules of Bankruptcy Procedure and by e-mail upon the parties that receive notifications in this case pursuant to the Court's ECF system.

/s/ Scott A. McMillan
Scott A. McMillan

MASTER SERVICE LIST
(As of July 2, 2009)

VIA E-MAIL

Counsel for the Debtors
Toby L. Gerber
Kristian W. Gluck
Ryan E. Manns
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
E-Mail:      tgerber@fulbright.com
        kgluck@fulbright.com
        rmanns@fulbright.com

Counsel for the Debtors
Berry D. Spears
Anna M. Mendez
Fulbright & Jaworski L.L.P.
600 Congress Avenue, Suite 2400
Austin, TX 78701
E-Mail:      bspears@fulbright.com
        amendez@fulbright.com

Counsel for Administrative Agent
Steven M. Fuhrman
Elisha D. Graff
Simpson Thatcher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
E-Mail:      sfuhrman@stblaw.com
        egraff@stblaw.com

Texas Counsel for Administrative Agent
Daniel C. Stewart
William Wallander
Rebecca Petereit
Vinson & Elkins LLP
2001 Ross Avenue, Suite 3700
Dallas, TX 75201
E-Mail:      dstewart@velaw.com
        bwallander@velaw.com
        rpetereit@velaw.com

Diana Jacobs
U.S. Bank National Association
1420 Fifth Avenue, 7th Floor
Seattle, WA 98101
E-Mail:      diana.jacobs@usbank.com

Rebwar Berzinji
Ahab Capital Management, Inc.
299 Park Avenue, 17th Floor
New York, NY 10171
E-Mail:      rb@ahabcap.com

Alex Zyngier
Smith Management LLC
885 Third Avenue
New York, NY 10022
E-Mail:      azyngier@smithnyc.com

Nate Schwartz
Techniservice
738 West Cypress Street
P.O. Box 817
Kennett Square, PA 19348
E-Mail:
nschwartz@techniservice.com

Patrick O'Neil
Communication Workers of America
35 Edes Road

Cumberland, ME 04021
E-Mail:     patrickeoneil@gmail.com

Dan Pevonka
RR Donnelley Credit Services
3075 Highland Parkway
Downers Grover, IL 60515
E-Mail:     dan.pevonka@rrd.com

Counsel for Unsecured Creditors'
Committee:
Mark Shinderman
Haig M. Maghakian
Linda Dakin-Grimm
Dan Perry
Milbank, Tweed, Hadley & McCloy,
LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017
E-Mail:
mshinderman@milbank.com
        hmaghakian@milbank.com
        ldakin-grimm@milbank.com
        dperry@milbank.com

Local Counsel for Unsecured Creditors'
Committee:
Trey Monsour
Frances Smith
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
E-Mail:
trey.monsour@haynesboone.com
        frances.smith@haynesboone.com

Elizabeth Banda
Perdue, Brandon, Fielder, Collins &
Mott
P.O. Box 13430
Arlington, TX 76094
E-Mail:     arlbank@pbfcm.com

David McCarty
T. William Opdyke
Kyle J. Mathews
Sheppard Mullin
333 South Hope Street, 48th Floor
Los Angeles, CA 90071
E-Mail:
wopdyke@sheppardmullin.com
        dmccarty@sheppardmullin.com
        kmathews@sheppardmullin.com

Laurie A. Spindler
Linebarger Goggan Blair & Sampson,
LLP
2323 Bryan Street, Suite 1600
Dallas, TX 75201
E-Mail:
dallas.bankruptcy@publicans.com

Paul M. Rosenblatt
Kilpatrick Stockton LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
E-Mail:
prosenblatt@kilpatrickstockton.com

Bruce Simon
Richard Seltzer
Joseph Vitale
Cohen, Weiss and Simon, LLP
330 West 42nd Street
New York, NY 10036
E-Mail:      bsimon@cwsny.com
             rseltzer@cwsny.com
             jvitale@cwsny.com

Sanford R. Denison
Baab & Denison, LLP
2777 N. Stemmons Freeway, Suite 1100
Dallas, TX 75207
E-Mail:      denison@baabdenison.com

Jeffrey R. Fine
Daniel I. Morenoff
K&L Gates LLP
1717  Main Street, Suite 2800
Dallas, TX 75201
E-Mail:      jeff.fine@klgates.com
             dan.morenoff@klgates.com

Jill Levi
David B. Rosenberg
Todd & Levi, LLP
444 Madison Avenue, Suite 1202
New York, NY 10022
E-Mail:      jlevi@toddlevi.com
             drosenberg@toddlevi.com

J. Scott Douglass
909 Fannin Street, Suite 1800
Houston, TX 77010
E-Mail:      jsdlaw@msn.com

William A. Frazell
Assistant Attorney General
Bankruptcy & Collections Division
P.O. Box 12548
Austin, TX 78711
E-Mail:      bill.frazell@oag.state.tx.us

Scott E. Blakeley
Blakeley & Blakeley LLP
4685 MacArthur Court, Suite 421
Newport Beach, CA 92660
E-Mail:      seb@blakeleyllp.com

Bruce J. Ruzinsky
D. Elaine Conway
Jackson Walker L.L.P.
1401 McKinney Street, Suite 1900
Houston, TX 77010
E-Mail:      bruzinsky@jw.com
             econway@jw.com

Robert G. Richardson
Heather M. Forrest
Jackson Walker L.L.P.
901 Main Street, Suite 6000
Dallas, TX 75202
E-Mail:      rrichardson@jw.com
             hforrest@jw.com

Scott K. Brown
Lewis and Roca LLP
40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
E-Mail:      sbrown@lrlaw.com

Streusand & Landon, LLP
515 Congress Avenue, Suite 2523
Austin, TX 78701
E-Mail:

Sabrina L. Streusand

streusand@streusandlandon.com

Stephen H. Gross
Hodgson Russ LLP
60 East 42nd Street, 37th Floor
New York, NY 10165
E-Mail:      sgross@hodgsonruss.com

Hugh P. Hughes
P.O. Box 300
Sumterville, FL 33585
E-Mail:      hphughes@webtv.net

Charles J. Filardi, Jr.
Filardi Law Offices LLC
65 Trumbull Street, 2nd Floor
New Haven, CT 06510
E-Mail:      charles@filardi-law.com

Scott A. McMillan
Evan Kalooky
The McMillan Law Firm, APC
4670 Nebo Drive, Suite 200
La Mesa, CA 91941
E-Mail:      scott@mcmillanlaw.us

Charles M. Kagay
Spiegel Liao & Kagay, LLP
388 Market Street, Suite 900
San Francisco, CA 94111
E-Mail:      cmk@slksf.com

Ronald M. Mapel
40 W. Twohig, Suite 213
San Angelo, TX 76903
E-Mail:
mapel@suddenlinkmail.com

Andrea Sheehan
Law Offices of Robert E. Luna, PC
4411 N. Central Expressway
Dallas, TX 75205
E-Mail:      sheehan@txschoollaw.com

David Sachs
Aronberg Goldgehn
330 N. Wabash Avenue, Suite 1700
Chicago, IL 60611
E-Mail:      dsachs@agdglaw.com

Timothy A. Bortz
U.S. Tax Agent, Bankruptcy
Representative
Commonwealth of Pennsylvania
Department of Labor and Industry
Reading Bankruptcy & Compliance Unit
625 Cherry Street, Room 203
Reading, PA 19602
E-Mail:      tbortz@state.pa.us

Luther Dickie Abel
408 South 4th Street
Gadsden, AL 35901
E-Mail:
famouslawyer182@aol.com

Elinor P. Smith
4931 S. Westshore Blvd.
Tampa, FL 33611
E-Mail:
elinorpsmithpa@hotmail.com

Christopher R. Belmonte
Pamela A. Bosswick
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, NY 10169
E-Mail:     cbelmonte@ssbb.com
       pbosswick@ssbb.com


Laurie Babich
Baker & McKenzie LLP
2001 Ross Avenue, Suite 2300
Dallas, TX 75201
E-Mail:
laurie.d.babich@bakernet.com

Christine E. Devine
Mirick O'Connell DeMallie & Lougee,
LLP
1700 West Park Drive
Westborough, MA 01581
E-Mail:
bankrupt@mirickoconnell.com
      cdevine@mirickoconnell.com

Alfredo R. Perez
Weil Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, TX 77002
E-Mail:     alfredo.perez@weil.com

Ramona Neal
Corporate Counsel
Hewlett-Packard Company
11311 Chinden Blvd.
Mailstop 314
Boise, ID 83714-0021
E-Mail:     Ramona.neal@hp.com

Ken Higman
Sr. Default & Recovery Analyst
Hewlett-Packard Company
2125 E. Katella Avenue, Suite 400
Anaheim, CA 92806
E-Mail:     ken.higman@hp.com

Dennis D. Miller
Stein & Lubin LLP
600 Montgomery Street, 14th Floor
San Francisco, CA 94111
E-Mail:     dmiller@steinlubin.com

Susan Mills Richmond
Lexow, Berbit & Associates, PC
P.O. Box 239
56 Park Avenue
Suffern, NY 10901
E-Mail:     lba@lexowberbit.com

Kim R. Lynch
Forman Holt Eliades & Ravin LLC
80 Route 4 East, Suite 290
Paramus, NJ 07652
E-Mail:     klynch@formanlaw.com


Houston, TX 77010
E-Mail:
paul.turner@sutherland.com

Paul B. Turner
Sutherland Asbill & Brennan LLP
Two Houston Center
919 Fannin, Suite 2200

Mark D. Sherrill
Sutherland Asbill & Brennan LLP
1275 Pennsylvania Avenue, NW

ADVERSARY COMPLAINT

Washington, DC 20004
E-Mail:
mark.sherrill@sutherland.com

Joe E. Marshall
Jonathan L. Howell
Munsch Hardt Kopf & Harr, PC
500 N. Akard Street, Suite 3800
Dallas, TX 75201
E-Mail:      jmarshall@munsch.com
       jhowell@munsch.com

John R. Roberts
Belkys Escobar
One Harrison Street, S.E.
5th Floor, (MSC #6)
Leesburg, VA 20175
E-Mail:
belkys.escobar@loudoun.gov

Nicholas A. Foley
David Ellerbe
Neligan Foley LLP
325 N. St. Paul, Suite 3600
Dallas, TX 75201
E-Mail:      nfoley@neliganlaw.com
       dellerbe@neliganlaw.com

Mark E. Andrews
Aaron Kaufman
Cox Smith Matthews Incorporated
1201 Elm Street, Suite 3300
Dallas, TX 75270
E-Mail:      mandrews@coxsmith.com
       akaufman@coxsmith.com

Kevin M. Lippman
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, TX 75201
E-Mail:      klippman@munsch.com

Shawn M. Christianson
Buchalter Nemer, PC
333 Market Street, 25th Floor
San Francisco, CA 94105
E-Mail:
schristianson@buchalter.com

Patti Davidson
Chief Deputy Treasurer
Pima County Treasurer
115 N. Church Avenue
Tucson, AZ 85701
E-Mail:      pcaocvbk@pacao.pima.gov

Craig Billings Miller
Neider & Boucher, SC
400 Science Drive, Suite 300
Madison, WI 53711
E-Mail:
cmiller@neiderboucher.com

Shawn B. Rediger
Williams, Kastner & Gibbs PLLC
601 Union Street, Suite 4100
Seattle, WA 98101
E-Mail:
srediger@williamskastner.com

Mary Jo Heston
Steven B. Winters
Lane Powell PC
1420 Fifth Avenue, Suite 4100
Seattle, WA 98101
E-Mail:        hestonm@lanepowell.com
        campbelld@lanepowell.com
        winterss@lanepowell.com

sea.bankruptcy.ecf@lanepowell.com
        docketing-sea@lanepowell.com

Grant Cook
The Cook Law Firm
5701 Woodway, Suite 330
Houston, TX 77057
E-Mail:
gcook@cooklawonline.com

Mack Ed Swindle
Whitaker, Chalk, Swindle & Sawyer,
LLP
301 Commerce Street, Suite 3500
Fort Worth, TX 76102
E-Mail:
mswindle@whitakerchalk.com

Peter Talbot on behalf of
Creditor Aaron Clark
554 Rosemary Cir
Media, PA 19063

E-Mail: waterlaw1@verizon.net

Larry K. Hercules
1400 Preston Road, Suite 280
Plano, Texas 75093
E-Mail: lkhercules@yahoo.com

**VIA FIRST CLASS MAIL**

Debtors
Idearc Inc.
Attn: Mr. Cody Wilbanks
2200 West Airfield Drive
P.O. Box 619810
DFW Airport, TX 75261

George F. McElreath
Office of the United States Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242

Texas Comptroller of Public Accounts
P.O. Box 13528, Capitol Station
Austin, TX 78711

Securities & Exchange Commission
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604

U.S. Attorney, Northern District of
Texas
Attn: James T. Jacks
1100 Commerce Street, Room 300
Dallas, TX 75242
IRS
1100 Commerce Street
MC 6610 DAL/Room 1021
Dallas, TX 75242

Charles A. Szybist
423 Mulberry Street
Willlamsport, PA 17701

Vicky Namken
IBM Corporation
13800 Diplomat Drive
Dallas, TX 75234

Hollie N. Hawn

Broward County Revenue Collection
Div.
Bankruptcy and Litigation Section
Government Center Annex
115 S. Andrews Avenue
Fort Lauderdale, FL 33301

Man-Ling Kua, Tax Services Clerk I
L.A. County Treasurer and Tax Collector
P.O. Box 54110
Los Angeles, CA 90054

Angela Dodd
Securities and Exchange Commission
175 West Jackson Blvd., Suite 900
Chicago, IL 60604

Marvin T. Durvin
Durbin & Durbin, LLP
600 Rand Building
Buffalo, NY 14202

Richard J. Maseles
Special Assistant Attorney General
Missouri Department of Revenue
301 W. High Street, Room 670
P.O. Box 475
Jefferson City, MO 65101

Reedy Macque Spigner
Spigner & Gallerson, PC
555 Republic Drive, Suite 101
Plano, TX 75074